BRENT WHITE, APPELLANT AND CROSS-APPELLEE, V. BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA AT LINCOLN, APPELLEE AND CROSS-APPELLANT.

614 N.W. 2d 330

Filed July 21, 2000.   No. S-99-102.

Jefferson Downing, of Keating, O'Gara, Davis & Nedved, P.C., and, on brief, Brett McArthur for appellant.

John C. Wiltse for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Brent White appeals from a judgment of the district court for Lancaster County, Nebraska, dismissing his claim for damages and injunctive relief against the Board of Regents of the University of Nebraska at Lincoln (University) based upon the alleged wrongful use of a registered trade name. The district court found that White was not entitled to relief because he failed to establish that he actually used the trade name "Husker Authentics" prior to registering it with the Nebraska Secretary of State. The University cross-appeals, contending the district court erred in dismissing its counterclaims for breach of contract and common-law trade name infringement. We affirm, although for reasons different from those articulated by the district court.

## I. FACTS

In late 1995, the University of Nebraska-Lincoln Athletic Department (Department) internally proposed the establishment of an "authentic shop" which would sell to the public apparel and equipment used by its teams and staff. The Department thereafter began making plans related to the development of the new store. As part of this process, the Department began test marketing the sale of "authentic goods" with the intent of developing purchasing statistics for the new store. The test marketing was conducted over a 7-month period beginning in the spring of 1996. According to Christopher Bahl, the director of licensing and sales for the Department, "authentic goods" referred to the exact product used, developed, or produced by the Department, such as a football autographed by the players or exact replicas of coaches' shirts and players' jerseys.

The test marketing was conducted through two principal means. Soft goods, such as T-shirts, sweatshirts, and other apparel, were marketed pursuant to an agreement with Eastbay, a mail-order catalog business located in Wausau, Wisconsin. An Eastbay catalog was developed through the joint efforts of Eastbay and the Department. This catalog, which displayed various styles of Nebraska Cornhusker wearing apparel, manufactured by "adidas," was mailed by the Department directly to season ticket holders, boosters who had donated money to the Department, and approximately 50,000 alumni of the University of Nebraska-Lincoln. The catalog was also distributed on game day at Memorial Stadium in Lincoln for one football game during the fall 1996 season. The catalog displayed, in the upper right-hand center, a large "N" over which the word "Husker" was written in script, with the word "Authentics" written underneath in italicized and capitalized block letters. This logo was developed generally by the Department. The catalog also displayed a picture of the then University of Nebraska-Lincoln football coach Tom Osborne, who was quoted as stating, "Husker Authentics is your official provider of Nebraska/adidas sideline shoes and apparel." Beneath the quote in small print was the language, "Husker Authentics is brought to you by the University of Nebraska - Athletic Department, adidas & Eastbay." The address and telephone number listed on the cata-

log were that of Eastbay. Pursuant to the agreement with Eastbay, the Department received 4 percent of gross sales generated by the catalog.

During the same 7-month time period, the Department test marketed "hard goods" pursuant to an agreement with Awards Unlimited, Inc., a Lincoln business. Hard goods are items such as footballs, photographs, posters, and videos. These products were marketed in essentially the same manner as the soft goods in that a catalog or order form containing a list of available items and their description was directly mailed by the Department to season ticket holders, boosters, and 50,000 alumni of the University of Nebraska-Lincoln. The catalog or order form for the hard goods did not contain a "Husker Authentics" logo similar to that displayed on the Eastbay catalog, but did contain a regular "N" with "Huskers" written over it in script in the lower left-hand corner. The top of the catalog or order form was entitled "Authentic Nebraska Athletic Department Products," and the address listed on the form was "Husker Authentics, 1935 'O' Street, Lincoln, NE 68510." Pursuant to the agreement between the parties, Awards Unlimited operated as a fulfillment house for processing orders and storing inventory, and the Department received revenues from merchandise sold. In addition to this catalog or order form, Bahl testified that the Department also ran advertisements in the magazine Huskers Illustrated and a Lincoln newspaper for the "hard goods." On cross-examination, Bahl admitted that the Department's test marketing was not directed at the general public.

On July 11, 1996, the "Board of Regents of the University of Nebraska d/b/a UNL Department of Athletics" filed an application with the Nebraska Secretary of State to register the trade name "Husker Authentics." The application stated that the first use of the name in Nebraska was in June 1996 and that the nature of the business was "Sales of University of Nebraska-Lincoln licensed goods." Because the University did not file the requisite proof of publication of the name with the Secretary of State and the county clerk as required by Neb. Rev. Stat. § 87-219 (Reissue 1999), the Secretary of State subsequently canceled the registration. The Department was not aware of the

cancellation until June 30, 1997, and, after registering the trade name, continued making plans to open its new retail store.

From 1989 to 1998, White owned and operated two Lincoln businesses named "Nebraska Spirit" and "Team Spirit Industries." Both businesses were engaged in screen printing, embroidering, and selling clothing and novelty items related to a theme of the University of Nebraska-Lincoln athletics. White was aware of the Department's plan to open a retail outlet store to sell authentic goods in February 1997. He opposed the opening of the store, fearing competition with his businesses. Upon inquiry, White was informed by the Secretary of State on June 26, 1997, that the Department's registration of the trade name "Husker Authentics" was canceled due to improper publication. That same day, White filed an application for registration of the trade name "Husker Authentics." The application indicated that the trade name was first used in Nebraska on the date of the application and that the general nature of the business was a retail sportswear store. White completed all of the requirements for registration and was granted registration of the trade name "Husker Authentics." At trial, White testified that he wanted to use the trade name for a new business, as a name for a department in his store, or to identify his products. He specifically acknowledged that the registration was motivated in part by his desire to prevent the Department from opening its retail store. White further testified that he did not actually use the trade name "Husker Authentics" for his business because he expected the Department to litigate the issue and he did not want to "invest a dime" of his money until the situation was settled in the courts.

The Board of Regents is the governing body for the University and, as such, is the owner of a number of trademarks, service marks, and trade names associated with the University. The University is a "Member University" represented by The Collegiate Licensing Company (CLC), its exclusive licensing agent. CLC is authorized to grant licenses to third parties, which licenses allow specified use of the indicia that are associated with the University. A license is required for persons who produce or manufacture any of the indicia which the University owns, although a license is not required to simply sell such

products in a retail business. White obtained such a license to produce and manufacture the University's indicia for the period January 27, 1995, to January 31, 1998. Approximately 3 weeks after registering the trade name "Husker Authentics," White received a letter dated July 16, 1997, from CLC's counsel informing him that his registration was in violation of the license agreement and that failure to transfer his registration to the University within 15 days would subject his license agreement to "immediate termination." A second letter, dated August 7, 1997, informed White that if a written response, including verification that he had taken steps to transfer the registration, was not received by August 14, the license agreement "will be terminated immediately." White responded to the July 16 letter on August 8, before receiving the August 7 letter, and informed CLC that he was "canceling [his] license agreement." White testified that after sending his August 8 letter, he never received confirmation that his license was canceled, but he did not after that date manufacture or produce products subject to the license agreement.

After learning of White's registration of the trade name "Husker Authentics" from a published notice, the Department inquired of the Secretary of State and learned that its prior application for registration had been canceled because the process had not been completed, as noted above. On June 30, 1997, the "Board of Regents of the University of Nebraska d/b/a UNL Department of Athletics" attempted to register the trade name "Huskers Authentic," but the Secretary of State refused to register the name due to the similarity with the name previously registered by White.

On July 28, 1997, the University filed a trademark application with the Secretary of State. The mark sought to be registered was described as an "[o]val shaped logo with a block 'N' with a script 'Huskers' through it (on the left side of logo) followed by a block lettered 'Authentic.'" The application stated that the mark was first used in June 1996 and was used by applying it directly to goods and to tags or labels affixed to goods. The record does not indicate whether the trademark application for registration was accepted and does not indicate whether the mark was actually used in June 1996.

On February 22, 1997, the University approved a project budget for the retail store which would "be a showcase for the retail and direct mail merchandising efforts of the UNL Athletic Department." The store officially opened August 27, 1997, under the name "Huskers Authentic." On September 3, White filed a petition requesting that the University be enjoined from using the trade name "Huskers Authentic." An amended petition was filed September 15, seeking both an injunction and damages. The University filed an answer generally denying White's claims. The University also counterclaimed, asserting a right to injunctive relief and damages based upon breach of contract, violation of common-law and statutory trade name and trademark rights, contravention of the dilution statute, and common-law unfair competition.

In an order filed December 1, 1998, the district court found that White's registration was improperly granted because he had not actually used the trade name prior to registration. The court further found that the University's subsequent trade name application could not be registered due to a similar failure of proof of use prior to registration. The court found that there was no merit to the University's contention that White breached his licensing agreement by registering the trade name. The court also found that the University failed to establish common-law rights to the name "Husker Authentics" because any proof of prior use related only to use as a trademark, and not as a trade name. In addition, the district court refused to issue an injunction against White's use of the trade name, finding that because White never used the name, there was no likelihood of confusion. White timely appealed, and the University cross-appealed.

## II. ASSIGNMENTS OF ERROR

White assigns, summarized and restated, that the district court erred in finding that White had failed to meet his burden of proof and in dismissing his petition.

The University assigns, summarized and restated, that the district court erred in (1) failing to find White breached the license agreement, (2) failing to find a threatened violation of its common-law rights, (3) failing to find a threatened violation of

its statutory rights, (4) failing to permanently enjoin White, and (5) denying an award of costs.

### III. STANDARD OF REVIEW

■ When an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent, correct conclusion irrespective of the determination made by the court below. *Cole v. Loock*, 259 Neb. 292, 609 N.W.2d 354 (2000).

■ An action for injunction sounds in equity. *Central States Found. v. Balka*, 256 Neb. 369, 590 N.W.2d 832 (1999); *Putnam v. Fortenberry*, 256 Neb. 266, 589 N.W.2d 838 (1999). On appeal from an equity action, the appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the conclusion reached by the trial court. *Hornig v. Martel Lift Systems*, 258 Neb. 764, 606 N.W.2d 764 (2000).

### IV. ANALYSIS

#### 1. WHITE'S APPEAL

The district court found that White's registration of the trade name "Husker Authentics" was improperly granted and ordered that it be canceled. The court reasoned that actual use and adoption of the trade name is required pursuant to Neb. Rev. Stat. §§ 87-208 to 87-220 (Reissue 1994) before a registration can be enforced and that White failed to meet this requirement because he admitted in his testimony that he never used the trade name at any time other than on his application for registration. Thus, the issue before us is one of statutory interpretation.

On appeal, White contends that the district court misinterpreted the statute. He argues that the Nebraska statutes do not require actual use prior to registration and that his registration established a prima facie case of ownership of the trade name which the University could overcome only by demonstrating its prior use of the name. The University contends that White's registration was improperly granted because he never used "Husker Authentics" as a trade name or, alternatively, was invalid because the University had acquired a prior common-law right in the name through its use of the name "Husker Authentics" on

products during 1996 and its decision in January 1997 to use the name "Huskers Authentic" for its retail outlet.

At the time of the operative facts in this action, Nebraska law applicable to protection of trade names was codified at §§ 87-208 to 87-220. Section 87-208(4) defined "trade name" as "every name under which any person does or transacts any business in this state other than the true name of such person." Section 87-210 set forth the requirements for an application for registration of a trade name, providing:

> [A]ny person who adopts a trade name for use in this state may file in the office of the Secretary of State on a form furnished by the Secretary of State an application, in duplicate, for registration of the trade name setting forth, but not limited to, the following information:
>
> (a) The name and street address of the applicant for registration; and, if a corporation, the state of incorporation;
>
> (b) The trade name sought to be registered;
>
> (c) The general nature of the business in fact conducted by the applicant;
>
> (d) The length of time during which the trade name has been used in this state;
>
> (e) The signature of the applicant, which must be acknowledged before a notary public; and
>
> (f) A filing fee of one hundred dollars.

Section 87-211 provided procedures for renewing a registration, and specifically stated "[a]ll applications for renewals . . . shall include a statement that the trade name is still in use in this state." Section 87-216 provided that one who wrongfully used a registered trade name was civilly liable to the registrant. Section 87-217 provided that "[a]ny registrant of a trade name" may sue to enjoin its wrongful use by another and recover damages attributable to such use. Section 87-218 provided that "Sections 87-208 to 87-219 shall not adversely affect rights in trade names, or the enforcement of rights in trade names, acquired at any time in good faith at common law."

The district court reasoned that the requirement in § 87-210(1)(d) that the applicant for registration must state the length of time during which the trade name has been used in Nebraska supported its conclusion that there must be actual use

of the trade name in connection with a business before it can be registered. Examined in isolation, this statutory language can reasonably be interpreted to require that actual use of the name must be made prior to registration. In addition, the language requiring that the business be "in fact conducted" at the time of registration also supports this interpretation, as does the renewal provision which requires continuing use of the name. §§ 87-210(1)(c) and 87-211. Such an interpretation is consistent with common law, which requires actual use before substantive rights in a designation can be obtained because it is only such use that creates goodwill and the possibility that subsequent use will lead to confusion as to the source of the goods. See Restatement (Third) of Unfair Competition § 18, comment *a*. (1995).

However, whereas the Legislature provided in Neb. Rev. Stat. § 87-113 (Reissue 1999) that a trademark may be registered by "any person who adopts and uses" it, different language was used in § 87-210 with respect to registration of a trade name. There, the Legislature provided that registration may be accomplished by "any person *who adopts a trade name for use* in this state" (emphasis supplied) § 87-210, which could be interpreted as meaning that adoption and registration may occur before actual use of the trade name. According to the Restatement, registration under a state trade name registration act creates no substantive rights in the name. *Id.*, § 12, comment *c*. Rights can be acquired in a designation "only when the designation has been actually used" as a trademark or trade name or "when an applicable statutory provision recognizes a protectable interest in the designation prior to actual use." *Id.*, § 18 at 184. However, the Restatement notes that trade name acts in several states specifically recognize a right in the *registrant* of a trade name to proceed under the statute against other users of the same or similar name. *Id.*, § 12, comment *c.*, and reporters' note, comment *c.*, citing § 87-216.

We have never addressed the specific issue of whether an enforceable right is created by the registration of a trade name which has never been used by the registrant, and we need not resolve it in this case. Assuming without deciding that actual use of a trade name is not a prerequisite to its valid registration

under § 87-210, we conclude on de novo review that the University had prior common-law rights superior to those of White in the trade name "Husker Authentics" and that therefore the district court properly canceled White's registration. See § 87-214(4)(b) and (5). In *Chadron Opera House Co. v. Loomer*, 71 Neb. 785, 787, 99 N.W. 649, 650 (1904), we stated that in order to establish a legally protectable common-law interest in a trade name, a party

> must make it appear, with at least reasonable certainty, that his adoption of the name was prior in time to that of his adversary; that he adopted and made use of it in such manner as would reasonably apprise the public that he intended it as a distinctive appellation for his trade, commodity, or place of business, and that it was not, at the time of his attempted appropriation of it, in common or general use in connection with like businesses, commodities, buildings, or localities.

This is consistent with Restatement (Third) of Unfair Competition § 18 at 184 (1995), which provides that "[a] designation is 'used' as a trademark, trade name, collective trademark, or certification mark when the designation is displayed or otherwise made known to prospective purchasers in the ordinary course of business in a manner that associates the designation with the goods, services, or business of the user . . . ." The Restatement further provides:

> One who has used a designation as a trademark, trade name, collective mark, or certification mark under the rule stated in § 18 has priority in the use of the designation over another user:
>
> (a) in any geographic area in which the actor has used the designation in good faith or in which the designation has become associated with the actor as a result of good faith use before the designation is used in good faith by, or becomes associated with, the other; and
>
> (b) in any additional geographic area in which the actor has priority over the other under an applicable statutory provision.

*Id.*, § 19 at 194-95. We adopt the common-law definition for "use" of a trade name or other designation set forth in § 18 of

the Restatement and the rule with respect to priority of use set forth in § 19.

At common law, the use of a trade name may be established by its appearance on signs, documents employed in conducting business, mail solicitations, or advertising. *Id.*, § 18, comment *d.* The record reveals that "Husker Authentics" was used by the Department on both mail solicitations and advertising. Specifically, the record reveals that the Department engaged in test marketing pursuant to agreements with both Eastbay and Awards Unlimited. Bahl testified that both mailings were sent to season ticket holders, boosters, and 50,000 alumni of the University of Nebraska-Lincoln, and that Eastbay catalogs were distributed at one home football game at Memorial Stadium. In addition, Bahl testified that "hard goods" were marketed in the magazine Huskers Illustrated and in a Lincoln newspaper. The test marketing was conducted as part of a series of steps taken to prepare for the opening of the Department's store and was specifically conducted to develop purchasing statistics. Although the name was admittedly not used in marketing directed at the general public, the name "Husker Authentics" was used in the ordinary course of business by the Department. The question thus becomes whether it was used in a manner that would associate it with the products and business of the Department.

The Eastbay catalog clearly used the logo "Husker Authentics" and contained a quote from Osborne stating that "Husker Authentics" was the provider of Nebraska apparel. The Department's agreement with Eastbay provided that it would receive 4 percent of the gross sales of the products in the catalog. This evidence establishes that the Department did conduct mail-order business under the name "Husker Authentics," which was a name other than its true name, and could reasonably apprise the public of its business. Similarly, the Awards Unlimited test marketing also involved the Department conducting mail-order business as "Husker Authentics." The Department engaged Awards Unlimited to be its fulfillment house, and the order form distributed by the Department listed the name of the business as "Husker Authentics," although it was actually the Department engaged in the business of selling

the products. This evidence further demonstrates the Department's prior use of "Husker Authentics" as a trade name.

Based upon our de novo review of the record, we disagree with the district court's determination that the University used "Husker Authentics" only in association with products and not with its conduct of business. The district court reasoned that the University utilized the name "Husker Authentics" as a trademark rather than as a trade name. However, the evidence summarized above demonstrates that the Department engaged in the business of selling such products using the name "Husker Authentics," which was not its true name, and thus used the name as a trade name. Persons ordering merchandise from either catalog could reasonably assume that they were purchasing products from a business named "Husker Authentics."

■ In addition, we note that the Eastbay catalog clearly reveals that the Department used a logo with a large block "N" with "Husker" written over it in script and the capitalized block letters "Authentics" underneath. At common law, "[r]ights in a trade name can also be infringed by its unauthorized use as a trademark, just as a trademark can be infringed by unauthorized adoption as a trade name." Restatement (Third) of Unfair Competition § 12, comment *b.* at 98 (1995). We therefore disagree with the district court's focus on the distinction between use of "Husker Authentics" as a trademark versus use as a trade name. See *Dynamet Technology, Inc. v. Dynamet Inc.*, 593 F.2d 1007 (C.C.P.A. 1979) (holding trade name use may be tacked on to trademark use for purpose of establishing priority).

■ As noted above, § 87-218 specifically provides that the statutes pertaining to registration of trade names "shall not adversely affect rights in trade names, or the enforcement of rights in trade names, acquired at any time in good faith at common law." In *Ransdell v. Sixth Street Food Store*, 174 Neb. 875, 120 N.W.2d 290 (1963), and *Personal Finance Co. v. Personal Loan Service*, 133 Neb. 373, 275 N.W. 324 (1937), we held that common-law trade name rights were enforceable notwithstanding the fact that other persons had subsequently registered the trade name with the Secretary of State. Accordingly, we hold that where one has acquired a common-law right in a trade name by its use, the subsequent registration of the trade name by the

Secretary of State upon the application of another is invalid and subject to cancellation pursuant to § 87-214.

In summary, we conclude on the basis of our de novo review that the University had a common-law right in the trade name "Husker Authentics" prior to White's registration of that name, and the registration was therefore invalid and must be canceled. Where the record demonstrates that the decision of the trial court is correct, although such correctness is based on a different ground from that assigned by the trial court, the appellate court will affirm. *Hornig v. Martel Lift Systems*, 258 Neb. 764, 606 N.W.2d 764 (2000); *Gordon v. Community First State Bank*, 255 Neb. 637, 587 N.W.2d 343 (1998). We therefore affirm the judgment of the district court canceling White's trade name registration and dismissing his petition.

## 2. CROSS-APPEAL

### (a) Contract Claim

The University contends that the district court erred in finding that the licensing agreement was rescinded by mutual consent, and in not determining that White's registration of "Husker Authentics" was in breach of the licensing agreement, thereby entitling the University to an order requiring White to transfer the registered trade name to the University pursuant to the remedial provisions of the licensing agreement. We find it unnecessary to resolve this issue because we affirm the district court's finding that the registration should be canceled. Pursuant to § 87-214(4)(b) and (5), the Secretary of State is required to cancel a trade name registration when the registrant is not the owner of the name or when a court of competent jurisdiction orders cancellation on any ground. Our judgment affirming that of the district court which determined that the trade name registration by White should be canceled will result in cancellation of the registration pursuant to this statute, leaving nothing which could be transferred to the University pursuant to the licensing agreement. The University does not claim and did not prove any damages resulting from the alleged breach. Therefore, the University would not be entitled to relief even if it prevailed upon its claim that White breached the licensing agreement by registering the trade name. An appellate court is not obligated to

engage in an analysis which is not needed to adjudicate the case and controversy before it. *In re Interest of Battiato*, 259 Neb. 829, 613 N.W.2d 12 (2000); *Brockhaus v. Lambert*, 259 Neb. 160, 608 N.W.2d 588 (2000). For this reason, we do not address the assignments of error pertaining to the licensing agreement.

### (b) Statutory and Common-Law Claims

The University contends that the district court erred in not awarding injunctive relief against White based upon alternative theories of common-law infringement and unfair competition, and violation of Nebraska's Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-301 to 87-306 (Reissue 1999). An injunction is an extraordinary remedy and ordinarily should not be granted except in a clear case where there is actual and substantial injury. Such a remedy should not be granted unless the right is clear, the damage is irreparable, and the remedy at law is inadequate to prevent a failure of justice. *Central States Found. v. Balka*, 256 Neb. 369, 590 N.W.2d 832 (1999). The only wrongful act alleged by the University as the basis for its claims was White's registration of the trade name "Husker Authentics," which has been held to be invalid and thus subject to cancellation. It is undisputed that White has never used or attempted to use the trade name "Husker Authentics," and he testified under oath that he had no intention of doing so until the ownership of the name was determined by a court. That determination has now been made in favor of the University, and there is no basis on this record to conclude that it will not be honored by White. Under these circumstances, we conclude that the University's claim for injunctive relief is without merit.

### V. CONCLUSION

We conclude that because the University had a prior common-law right to the trade name "Husker Authentics," the district court did not err in determining that White's registration of the trade name pursuant to § 87-209 was invalid and should be canceled. For the reasons stated above, we conclude that the University would not be entitled to transfer of the improperly registered trade name or injunctive relief under any of its alternative theories of recovery, and the district court therefore did

not err in not granting such relief. The judgment of the district court is therefore affirmed.

AFFIRMED.

HENDRY, C.J., not participating.